MARVIN WAYNE, Plaintiff-Appellee, v. EXXON COAL USA, INC., Defendant-Appellant.

Fifth District No. 5—86—0181

Opinion filed June 17, 1987.

Stuart Dobbs, of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, and G. Alan Kramer, of Exxon Coal USA, Inc., of Houston, Texas, for appellant.

Amiel Cueto, of Belleville, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Plaintiff Marvin Wayne brought this action in the circuit court of St. Clair County alleging he was wrongfully discharged by his employer, Monterey Coal Company (Monterey), a division of Exxon Coal USA, Inc., in retaliation for filing a claim for compensation under the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*). After a bench trial, the court found defendant liable to plaintiff in the amount of $801,716, divided evenly between compensatory and exemplary damages. Defendant appeals. There is no cross-appeal. We reverse.

Plaintiff was employed by Monterey from April 21, 1980, until his discharge in December of 1981 and was a member of the United Mine Workers of America (the union). His employment was governed by the National Bituminous Coal Wage Agreement of 1981 (the contract), which, *inter alia*, provided Monterey could not discharge an employee except for "just cause" and provided a grievance procedure (ultimately including binding arbitration) through which an employee could challenge his discharge. The contract also provided that just cause included any absence of two or more consecutive days without consent of the employer or proof of illness. The contract further provided that where management concluded an employee's conduct justified discharge, the employee "shall" be suspended with intent to discharge and "shall" be given written notice stating the reason.

Plaintiff missed six consecutive work days commencing September 15, 1980. Upon his return to work on September 23, plaintiff presented a medical excuse from Dr. Rene St. Leger as justification for his absence. Plaintiff admitted at trial that he was never a patient of Dr. St. Leger. Between September 15, 1980, and March 26, 1981, plaintiff submitted 10 such slips from Dr. St. Leger to justify approximately 81 days of absence. The longest absence covered by one slip was 20 consecutive days. Plaintiff admitted at trial that he knew he was wrong in submitting the bogus excuses and would be fired if caught. He was examined and testified:

"Q. You are saying that you knew that sooner or later when they caught up with you about those doctor's slips, you would be fired?

A. Yes, and if they fired me for those doctor's statements while I was at work, I had nothing coming. I was wrong ***.

* * *

Q. *** [I]f you had gotten back to work after your injury without ever receiving the letter of December the 1st, would you have thought you were back at work without running the risk of being fired if they found out about these doctor's slips?

A. No.

Q. You would still have felt you were under a risk?

A. If I had been back at work off of sick leave and they would have fired me, they would have no argument from me."

On July 14, 1981, plaintiff was injured while on the job. Plaintiff began receiving temporary total disability payments immediately. He never worked another day for Monterey. By letter dated July 22, Monterey requested proof of plaintiff's disability. Plaintiff submitted a letter from his treating physician indicating plaintiff was still being treated. In early August plaintiff underwent surgery. He was released from the hospital on August 8. As the result of an investigation into the authenticity of doctors' slips submitted by various employees, Monterey officials learned on August 18 that plaintiff's slips from Dr. St. Leger were bogus. By letter dated August 28 Monterey again requested proof of plaintiff's present disability. Plaintiff again responded with a letter from his physician. In September Monterey's workers' compensation carrier, which was also a division of Exxon, sent plaintiff to see Dr. Osborne, who referred plaintiff to Dr. Schultz, a neurologist. Based on the November 4 report of Dr. Schultz that plaintiff "can probably return to work if he can control his headaches and this should probably be possible with manipulations of his medication," the workers' compensation carrier advised Monterey it was cutting off plaintiff's benefits as of November 4. So advised, Monterey informed plaintiff by letter dated November 12, 1981, that his status had been changed from injured to absent without leave (AWOL) and that plaintiff had five days from receipt of the letter (November 19) to present satisfactory proof of disability to Gordon Roberts, the mine superintendent, or incur suspension with intent to discharge.

Plaintiff did not respond by November 19 and was suspended. On November 30 plaintiff phoned the mine office asking what he needed. By letter dated December 1 Roberts notified plaintiff of his termination "effective this date" pursuant to the letter of November 12. The

letter also noted that a copy was sent to the union. Also on December 1, plaintiff delivered to the mine office a partial disability certificate, dated September 28 and signed by his treating physician, which advised plaintiff could return for light duty. (Roberts testified Monterey did not allow people to work on light duty releases.) The next day plaintiff received Roberts' letter and phoned Roberts. According to plaintiff, he informed Roberts that plaintiff was still in the care of "their doctor" and was not released to return to work; Roberts told him to disregard the letter and that he would send another. According to Roberts he told plaintiff the slip received December 1 did not cover the period of disability to Monterey's satisfaction because it was only good up to its date; Roberts also referred to the bogus slips and stated he would rescind the December 1 letter and send another. By letter dated December 2 Roberts informed plaintiff the termination was "temporarily rescinded" pending determination of the exact nature of plaintiff's absence. The letter, accompanied by a notice of disciplinary action suspending plaintiff with intent to discharge for (1) falsification of doctor's slips and (2) irregular work, cited the 10 bogus slips covering the period ending in March of 1981 and informed plaintiff of his right to request a hearing with management to discuss the suspension by contacting the union. The letter recited delivery of a copy thereof to the union. Plaintiff testified this was the first time any employee or agent of defendant mentioned the doctor's slips. Plaintiff testified he considered himself fired when he received the December 1 letter.

By letter dated December 14 Monterey informed plaintiff of his removal from the payroll pursuant to the letter of December 2. Neither plaintiff nor the union filed a grievance based on any matters regarding the termination. Plaintiff testified he was treated for his July 1981 injury after the termination and that the insurance carrier did not pay for the treatment. In 1982 plaintiff filed a workers' compensation claim which resulted in plaintiff's receiving additional disability payments.

Plaintiff's complaint alleged he was fired in retaliation for filing a claim for benefits under the Workers' Compensation Act. Defendant's answer as amended alleged plaintiff failed to avail himself of the right to contest his discharge as provided in the contract. A copy of the contract was in evidence below and is included in the record on appeal. After trial, the circuit court entered judgment as recited above, explaining its reasoning in a written order in part as follows:

"The court further finds that plaintiff was discharged by defendant in retaliation for his receipt of workmen's compensa-

tion benefits that he began receiving shortly after his injury; that defendant intentionally misrepresented the report of Dr. Schulz [sic] in the letter to Marvin Wayne changing his status from injured to AWOL, and further that defendant discharged Marvin Wayne on December 1, 1981 in total violation of its own proper discharge procedures as set out in their agreement with the United Mine Workers in that the plaintiff was not suspended with the intent to discharge but simply discharged without benefit of any grievance procedure. By defendant's own admission, through [its] agent Gordon Roberts, the defendant had denied Marvin Wayne the right to prosecute any grievance by violating [its] own rules and procedures. Defendant's attorney also admitted that this discharge was improper in his own statement to the court, and thus testimony by Charles Pace concerning this procedure was stricken. Even if this testimony had not been stricken, no weight would have been given it due to the aforementioned."

■■ The first argument defendant raises is that the judgment was against the manifest weight of the evidence. We agree. To sustain an action for retaliatory discharge the plaintiff must prove a causal relationship between his protected conduct and the discharge. (*Slover v. Brown* (1986), 140 Ill. App. 3d 618, 620-21, 488 N.E.2d 1103, 1105.) Evidence not only uncontradicted but acknowledged by plaintiff showed a valid reason for his discharge. While we routinely defer to the trier of fact on issues of witness credibility and weight of the evidence (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, 626), plaintiff's admissions at trial left no such issues to decide.

■■ In light of the admittedly bogus doctor's slips, the physical process by which plaintiff was terminated and notified of his termination and the official date of termination were entitled to little if any weight. Such evidence could be no more than circumstantial evidence to support plaintiff's contention that the doctor's slips were a pretextual reason for the discharge. A pretext is a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs. (Webster's Third New International Dictionary 1797 (1971).) The admitted state of affairs was that plaintiff was absent from work on numerous occasions without valid excuse and lied to his employer, that this was just cause to fire plaintiff, and that plaintiff was found out, then suspended and discharged before he ever worked another day. To turn such admitted facts into a procedural tightrope the employer must walk to avoid a substantial judgment is a

situation not contemplated by *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, or any of its progeny.

Defendant raises numerous other issues on appeal, but in light of our review of the evidence we decline to comment on those issues. The judgment of the circuit court of St. Clair County is reversed.

Reversed.

KARNS, P.J.,[1] and HARRISON, J., concur.

---

[1]Justice Karns replaces Justice Jones, who retired after the case was taken under advisement.