KNIGHT'S PRAIRIE HUNTING CLUB, INC., *et al.*, Plaintiffs-Appellants, v. JIM HOLMES, Defendant-Appellee and Counterplaintiff-Appellee (Ruth Holmes, Counterplaintiff; Knight's Prairie Hunting Club, Inc., *et al.*, Counterdefendants-Appellants).

Fifth District    No. 5—92—0597

Opinion filed June 15, 1994.

Law Office of Terry Sharp, P.C., of Mt. Vernon, for appellants.

William A. Alexander and Peter E. Popit, both of Troutt, Alexander, Popit & Warner, of Benton, for appellee.

JUSTICE MAAG delivered the opinion of the court:

The plaintiffs, Knight's Prairie Hunting Club, Inc., an Illinois close corporation, Knight's Prairie Hunting Club, an Illinois not-for-profit association, and Gerry MacKenzie, an individual and shareholder in Knight's Prairie Hunting Club, Inc., appeal from a judgment of the circuit court of Hamilton County, claiming that the circuit court erred in the following ways: (1) by holding that the corporation did not ratify the lease because the corporation was never organized and did not function; (2) by failing to recognize that Knight's Prairie Hunting Club, Inc., had *de facto* corporate status when the lease was signed; (3) by ruling prospectively on the manner in which the stock in Knight's Prairie Hunting Club, Inc., should be split; and (4) by holding that the stock would not be held in trust for the benefit of Knight's Prairie Hunting Club.

Jim Holmes and Gerry MacKenzie met in the summer of 1988. Holmes expressed an interest in purchasing some property for the purpose of hunting. After touring the Triple T Farm with MacKenzie, Holmes decided that he would like to purchase it. He later called MacKenzie and asked him if he would object to Holmes buying the property himself. Ultimately, Holmes bought the Triple T Farm. The

two men then discussed the possibility of forming a hunt club to help Holmes finance the acquisition.

On November 23, 1988, Holmes and MacKenzie signed the articles of incorporation as the original incorporators of the Knight's Prairie Hunting Club, Inc. (hereinafter the corporation). James Van Winkle, attorney for MacKenzie, prepared a lease agreement. Holmes and the "corporation" entered into the lease agreement on December 4, 1988. The lease was filed in the office of the recorder of deeds of Hamilton County on November 22, 1989. Holmes signed as lessor, and MacKenzie signed on behalf of the corporation as its president. Pursuant to the terms of the lease, the corporation would pay rent to lease certain property from Holmes for the express purpose of operating a hunting club. The lease provided that the corporation would have exclusive control over all hunting privileges, and Holmes reserved the right for him and his immediate family to hunt on the premises. The office of the Secretary of State of the State of Illinois issued the articles of incorporation on December 7, 1988.

In September of 1989, an organizational meeting was held in order to form the Knight's Prairie Hunting Club (hereinafter the club). Because the prospective members of the club determined that they did not want to become stockholders in the corporation, they decided that they would pay dues and that would enable them to hunt in the year in which they paid their dues. Hence, the corporation and the club were to remain separate entities with Holmes and MacKenzie as the sole stockholders. Although the membership fee was $2,000 per person, Holmes and MacKenzie did not have to pay membership dues. It was determined that the club would use the property that the corporation leased for its hunting excursions. In fact, the rental payments provided in the lease were paid by the club and accepted by Holmes.

Eventually, a dispute arose over the parties' rights under the lease. Holmes believed that he had reserved the right for him and his family to hunt anytime he pleased without being restricted by the control of the club or its rules. In fact, even though Van Winkle drafted the lease for MacKenzie, he testified:

> "It was my understanding that *** [Holmes] and his family had the right to go *** hunting at any time ***. [T]here had been discussion about *** [Holmes'] occupation and that he didn't have per se a schedule and if he wanted to come out on Tuesday afternoon and go hunting, or whenever, it was my understanding that he reserved full hunting privileges that he and his family would come out at any time and go hunting whenever he pleased."

The lease, however, stated as follows:

"9. *CONTROL OF HUNTING: LESSEE SHALL HAVE THE EXCLUSIVE CONTROL OF ALL HUNTING PRIVILEGES ON THE PREMISES.* LESSOR RESERVES THE RIGHT FOR LESSOR AND LESSOR'S IMMEDIATE FAMILY TO HUNT ON THE PREMISES." (Emphasis added.)

The members of the club recognized that Holmes should be allowed to hunt; however, they believed that he should abide by the same rules that other members of the club faced pertaining to safety and wildlife code provisions. One of the rules that all of the members abided by was booking advance reservations to hunt. This was necessary so that no more than one hunting party would be on the premises at the same time which, in turn, made the hunting experience safer and more enjoyable.

Although the parties attempted to settle their differences, an agreement was never reached regarding Holmes' hunting privileges or the distribution of the stock. On August 9, 1990, the corporation and MacKenzie filed a complaint against Holmes, seeking to determine the hunting rights and privileges between the parties.

■ Initially, it is necessary to address the defendant's motion to strike exhibits B through F that are attached to the appellants' brief filed by plaintiff. Supreme Court Rule 329 (134 Ill. 2d R. 329) allows the parties to supplement the record with documents that were before the trial court but were not contained within the record on appeal. In the instant case, exhibits B through F were never filed in the trial court or considered by the trial judge. Attachments to briefs that are not a part of the record cannot be used to supplement the record. (See *Nameoki Township v. Cruse* (1987), 155 Ill. App. 3d 889, 895, 508 N.E.2d 1080, 1084.) Since matters not properly in the record will not be considered on review, the defendant's motion to strike exhibits B through F that are attached to the appellants' brief is granted.

The plaintiffs claim that the circuit court erred in determining that the lease agreement between the parties was void because "[it was executed at a time when the corporation] did not exist, and thereafter, there was no corporate ratification of said lease because the corporation was never organized and did not function." We agree.

■ The articles of incorporation state that the purpose for which the corporation was organized was to operate a recreational hunting club. The lease agreement furthered this concept by stating that its purpose was to lease certain property for a recreational hunting club. In fact, the defendant's counterclaim states that the corporation has exercised its hunting privileges as given by the lease through the club. Plaintiffs' exhibit 16(b), which is signed by both Holmes and MacKenzie, states that the corporation elects to be treated for tax

purposes as a subchapter S corporation. This exhibit shows that Holmes is a corporate officer and stockholder of the corporation.

Article 6 of the corporation's articles of incorporation provides that MacKenzie was to act as the director of the corporation until a successor was elected and qualified. If the articles provide for such shareholder management, no shareholders' meeting need be held in order to elect directors. (See 805 ILCS 5/2A.45(a)(1) (West 1992).) In fact, the shareholders will be deemed to be directors. (See 805 ILCS 5/2A.45(a)(2) (West 1992).) Although no formal shareholders' meetings were carried out, many meetings were held where Holmes, MacKenzie, and several club members discussed matters concerning the corporation, the club, its membership, and the official business of those various entities. Hence, we believe that MacKenzie, as director and shareholder, was authorized to act on behalf of the corporation and was empowered to enter into agreements allowing for management of corporate affairs by another entity such as the club. Therefore, we find the circuit court's basis for finding the lease agreement void to be in error.

Holmes claims that this is a contract question. He contends that the plaintiffs have confused the contract issue with the fact that he has admitted that the corporation received a certificate of incorporation and the fact that he has counterclaimed against the corporation. Holmes claims that because he entered into a lease with a nonexistent entity—the "corporation"—the lease is void.

Section 2.15 of the Illinois Business Corporation Act of 1983 (805 ILCS 5/2.15 (West 1992)) (hereinafter the Act) provides:

> "*Upon the issuance of the certificate of incorporation by the Secretary of State, the corporate existence shall begin,* and such certificate of incorporation shall be conclusive evidence, except as against the State, that all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under this Act." (Emphasis added.)

Because of the aforementioned statute, Holmes claims that the issuance of the certificate of incorporation is the "birth of the corporate legal entity." Holmes contends that prior to the issuance of a certificate of incorporation, a corporation cannot exist. Hence, Holmes claims that because the certificate of incorporation was not issued until three days after the lease agreement was signed, the lease is void.

The law in Illinois is that if an individual makes a lease with an entity that purports to be a corporation, he will be estopped to deny the separate corporate existence of the lessee. (*Boatman v.*

*Jordan* (1968), 102 Ill. App. 2d 55, 60, 243 N.E.2d 644, 647.) Because Holmes contracted with the corporation as a corporation, he has admitted its corporate existence (see *West Side Auction House Co. v. Connecticut Mutual Life Insurance Co.* (1900), 186 Ill. 156, 160, 57 N.E. 839, 841) and is now estopped to deny that the lease agreement was valid.

The plaintiffs further contend that the circuit court's ruling which split the stock 50/50 was beyond its authority.

Prior to the parties forming the corporation, Holmes and MacKenzie signed a contract indicating that they were partners and would divide their profits in the hunt club one-third to Holmes and two-thirds to MacKenzie. Even though Holmes agreed that the aforementioned agreement was to continue after the parties formed a corporation, he stated that the parties had agreed to split the stock on a 50/50 basis. In fact, James Van Winkle, the attorney for Gerry MacKenzie at that time, testified that "[t]here was to be a fifty-fifty split on the ownership but a [one-]third and two-thirds split on the profits" as indicated above. Van Winkle prepared a subchapter S election for the corporation. This document, plaintiffs' exhibit 16(a) (hereinafter exhibit 16(a)), states that the corporation had 1,000 shares of stock issued and outstanding. It also states that Holmes and MacKenzie each have 500 shares. Exhibit 16(a) is not signed. Van Winkle found another copy of the election in his files, plaintiffs' exhibit 16(b) (hereinafter exhibit 16(b)), which indicates that the corporation had 600 shares of stock issued and outstanding. This document indicates that MacKenzie has 600 shares of stock and Holmes has 300 shares of stock. Exhibit 16(b) is signed by Holmes and MacKenzie. This document puzzled Van Winkle because the purported amount of stock that was issued and outstanding in exhibit 16(b) was 600 shares. Van Winkle testified that 1,000 shares were to be issued. Also, the distribution in exhibit 16(b) of 600 shares to MacKenzie and 300 shares to Holmes does not equal the 600 shares that were purported to be issued as stated in exhibit 16(b) or the 1,000 shares purported to be issued in exhibit 16(a). Van Winkle stated that he did not prepare exhibit 16(b). He also stated that when the election document left his office, it was as shown in exhibit 16(a). He did not notice that the number of shares had been changed when the document was returned to his office.

MacKenzie testified that the election form that he received and signed indicated that Holmes would receive 500 shares and MacKenzie would receive 500 shares. Since it was MacKenzie's understanding that he would receive two-thirds of the stock and Holmes would receive one-third of the stock, he questioned Van Winkle about the

election in exhibit 16(a) in a handwritten note. MacKenzie did not know how exhibit 16(b) came into existence either. Holmes testified that he received and signed exhibit 16(a). He stated that he never signed exhibit 16(b). In fact, Holmes said that exhibit 16(b) was a "bogus forgery." Holmes testified that MacKenzie told him that he had altered exhibit 16(a) to exhibit 16(b) because he thought that Van Winkle had made a mistake when he filled out exhibit 16(a). Furthermore, MacKenzie admitted that he signed the corporation's 1989 tax return, indicating that Holmes' percentage of stock in the corporation was 50%. MacKenzie stated, however, that someone else had prepared the corporation's tax return and that he had not paid attention to the percentages listed in the return before he signed it.

Additionally, Van Winkle testified that he never issued the stock because he did not feel that it was appropriate considering that Holmes and MacKenzie were involved in a dispute over the percentages of stock that each of them owned.

A review of the record demonstrates that only one class of stock was issued. When only one class of stock is issued, each share of stock has the same rights as any other share. This includes the right to an equal share of profits on a per-share basis. Although the circuit court's ruling implicitly created two classes of stock since the profits were not equally divided and the stock was split 50/50, we believe that the circuit court's ruling was correct.

We believe that a review of the record demonstrates that both parties signed an election form which stated that each party was to receive 50% of the stock. We believe that exhibit 16(b), which purports otherwise, has been tampered with by someone. Van Winkle understood that each party believed that he had equal ownership rights in the corporation even though they had agreed to divide the profits on a one-third/two-thirds basis. Because the trial court is in a far better position than the appellate court to determine the credibility of the witnesses and the weight to be afforded conflicting testimony (see *In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, 71, 440 N.E.2d 840, 842), this court will not reconsider the evidence or reassess the witnesses' credibility or demeanor. (See *Horace Mann Insurance Co. v. Brown* (1992), 236 Ill. App. 3d 456, 465, 603 N.E.2d 760, 767.) Furthermore, this court will not substitute its judgment on these matters unless the trial court's findings are against the manifest weight of the evidence. (*La Salle National Trust, N.A. v. Village of Mettawa* (1993), 249 Ill. App. 3d 550, 568, 616 N.E.2d 1297, 1311.) Because we fail to see how the trial court's ruling was against the manifest weight of the evidence, we believe that the trial court's

ruling, stating that each party is to receive 50% of the stock, was appropriate.

■ Finally, the plaintiffs contend that the agreement to hold the corporation's stock in trust for the benefit of the club should be enforced. It is undisputed that Holmes and MacKenzie were the only stockholders of the corporation. They created the corporation for the purpose of operating a recreational hunting club. The club was financed by membership dues and fees paid by guests. It is undisputed that the club members were not stockholders.

In the September 9, 1989, minutes of the club, Harold McCutchen, a member of the club, made a motion that the membership to the club be authorized by the bylaws and that no stock be issued. Bill Bevins, another club member, seconded the motion. The record indicates that the motion passed. Then the minutes of the meeting state: "The operational procedure of the club is to be carried out by the club members and each member is to have one vote. In effect, Gerry MacKenzie and Jim Holmes, who retain the stock, will act as a holding company and will have a vote as will all club members." McCutchen testified, however, that the above-quoted language that is contained within the minutes was not part of his motion.

Furthermore, Van Winkle testified that the above-quoted portion did not accurately reflect the discussion at that meeting. Van Winkle stated that he recalled:

> "[T]hat the members were not to be stockholders. That Holmes and MacKenzie were to retain all the stock. That these memberships were yearly memberships. It was not as if they were binding the corporation on a permanent basis. The phrase 'holding company[,]' I don't think that was ever used at the meeting. The legal effect of this split between the stock ownership and the people who paid annual membership fees was not explored very well during that meeting, but it was understood that Mr. Holmes and Mr. MacKenzie would retain all the stock and that these were annual memberships."

Hence, we believe that a review of the record shows that the club members decided not to become stockholders of the corporation. Because they were not stockholders, no stock would be issued to the members. Therefore, we cannot say that the trial court erred in determining that the stock should not be held in trust.

In light of the foregoing considerations, we reverse the circuit court's order insofar as it declares the lease to be invalid and states that possession of the premises should be turned over to Holmes. Because the lease is valid, the parties must abide by the terms of the

lease. Further, we affirm the circuit court's stock split and its holding that the stock should not be held in trust for the benefit of the club. Motion to strike granted.

Affirmed in part; reversed in part.

LEWIS, P.J., and CHAPMAN, J., concur.